Jacob KOHN, et al., Plaintiffs,

v.

AMERICAN HOUSING FOUNDATION, INC. and National Healthcare Affiliates, Inc., d/b/a Julia Temple Center, Defendants.

Civ.A. No. 96–WM–1903.

United States District Court, D. Colorado.

March 26, 1998.

John R. Holland, Law Offices of John R. Holland, Kathleen Mullen, Law Offices of Kathleen Mullen, Denver, CO, for plaintiff/petitioner.

Bruce Montoya, Pryor, Johnson, Montoya, Carney & Karr, P.C., Englewood, CO, Thomas Quinn, White & Steele, Denver, CO, for defendant/respondent.

## ORDER DENYING MOTION FOR CLASS CERTIFICATION

MILLER, District Judge.

This case is before me on plaintiffs' motion for class certification. I have reviewed the parties' motions, briefs and affidavits, as well as the evidence and argument presented at a two-day hearing on this matter, and make the following findings and conclusions.

### *Jurisdiction*

This case was removed on the basis of federal question jurisdiction. 28 U.S.C. §§ 1331, 1441.

## Background

Plaintiffs are residents or former residents of the Julia Temple Center (the Center), a nursing home facility owned by defendant American Housing Foundation, Inc. (American) and managed, at the relevant times, by defendant National Healthcare Affiliates, Inc. (National). At all relevant times, the Center has been certified as a Medicaid provider under contract with the Colorado Department of Social Services.

Plaintiffs brought this lawsuit on their own behalf and as alleged representatives of a proposed class comprised of all persons who resided at the Center during any portion of the period between September 1993 through July 1, 1996.[1] Plaintiffs allege defendants provided substandard care in violation of federal and state statutes; their allegations are based on assertions of inadequate staffing and investment of capital and resources.

The complaint now alleges three class claims for compensatory damage relief:[2] (1) violations of the Colorado Consumer Protection Act, C.R.S. § 6–1–105(1)(e), (g); (2) willful and wanton and/or negligent breach of Medicaid contract (of which plaintiffs claim to be third-party beneficiaries); and (3) negligence per se. Plaintiffs also seek exemplary damages.

In support of their motion for class certification, plaintiffs provided affidavits, testimony, and documentary evidence indicating the existence of staffing and environment problems at the Center during the class period. Several of plaintiffs' affidavits conclude that the Center failed to hire and retain sufficient staff to maintain proper care.[3]

Using a standard of good care as providing 3.5 nursing hours per patient day, plaintiffs' evidence showed that the Center provided on average only 1.6 to 2.25 nursing hours per patient day during the relevant times and that some days were as low as 1.15 hours. As a result of staffing shortages, plaintiffs' witnesses believed patients at the Center received inadequate Assistance for Daily Living (ADL) and safety care, some were not bathed regularly, and incontinent patients were not always timely cleaned.

Plaintiffs also point to what they called a high number of incident reports, summarized in Exhibit 29, to demonstrate that patients were not adequately supervised or attended. Their witnesses opined that insufficient staffing levels were responsible for the large numbers of patient falls and altercations, as well as for the failure to meet the ADL needs of the Center residents.

Defendants challenge the generality of plaintiffs' evidence[4] and argue that there is no evidence that inadequate staffing and substandard environmental conditions were common causes of any injury to the proposed class members. Indeed, some evidence concerning the Colorado Department of Health, produced by plaintiffs, undermines plaintiffs' claims. Plaintiffs Introduced Department surveys which rate the conditions of the Center, focusing on various aspects of the Center's performance, including ADL and staffing levels and cleanliness of environment. See Exhibit 11. The April 1994 survey indicated multiple deficiencies in activity programs (ten of twenty-four residents were affected) and environment (sixteen of twenty-four rooms contained strong odors, were not home-like, or were not clean). Exhibit 11C2. Neither that survey, nor a resurvey conducted in June 1994, however, indicated any staffing or ADL problems. Only a March 1995

---

1. The proposed class consists of approximately 300 residents. During the class period, the Center held itself out as a facility specializing in providing care to very disabled persons suffering from severe dementia, including Alzheimer's disease.

2. As discussed below, the nature of remedy sought is a significant factor in my decision.

3. Affidavit of Mary Kramer, Exhibit 2; Affidavit of Marvin Bishop, Exhibit 5; and Affidavit of Janet Flanagan, Exhibit 6.

4. Former director of nursing at the Center, Mary Kramer, provided an affidavit in support of plaintiffs' contentions and then later qualified her statements in an affidavit provided for American's supplemental response. In the subsequent affidavit, she disagrees with several of the sweeping statements contained in the plaintiffs' briefs, as well as with statements in other affidavits provided by plaintiffs. See Exhibit A to American's Supplement.

survey cited the Center for staffing and ADL deficiencies. Exhibit 11C4. A later survey, conducted in February 1996, found that these problems had been corrected. Exhibit 11C5. In addition, none of the state surveys found any level "A" ratings, the most serious finding which indicates wide-ranging noncompliance.

One of plaintiffs' witnesses, Mildred Simmons, a nursing home consultant, testified that the Department may resort to any of a number of remedies to correct substandard care in a nursing home facility, including imposition of a receivership, installation of new management, or the closing of a facility. Ms. Simmons acknowledged that the state had apparently not felt justified to use such drastic remedies, imposing only cash penalties on the Center.

In addition, an inspector from the Department of Health could not verify allegations of inadequate staffing asserted against the Center. Defendants' Exhibit 18. And, ultimately, the Center passed the state review procedures, even if not with flying colors.[5]

Finally, defendants produced responsive evidence that conditions at the Center were not substandard. For example, the level of skin integrity problems among residents was lower than regional, state, and national levels. Defendants' Exhibit 19. Three doctors who had patients there swore in affidavits that no harm befell their patients.[6] Defendants' Exhibits 26 and 46. Importantly, family members of residents and others vigorously dispute plaintiffs' allegations of inadequate care or conditions. *See* Defendants' affidavits, Exhibits A, B, C, and D.

### Standard of Review

Plaintiffs seek certification on the issue of liability only. In order to maintain the action as a class action, plaintiffs bear the burden of establishing all the prerequisites of Fed. R.Civ.P. 23(a); in addition, plaintiffs must demonstrate that one of the circumstances provided in Rule 23(b) is satisfied. The Rule 23(a) prerequisites include:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representatives will fairly and adequately protect the interests of the class.

In this case, plaintiffs seek certification under Rule 23(b)(3):

(3) the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The determination of a motion for class certification is a matter within my discretion. *Boughton v. Cotter Corp.,* 65 F.3d 823, 826 (10th Cir.1995).

It is possible to certify a class upon the condition that the class be decertified later if evidence shows that certification was not warranted. *Id.,* at 827 n. 1. Despite this "out," determination of the certification factors requires "rigorous analysis." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982): *Masri v. Wakefield,* 106 F.R.D. 322, 324 (D.Colo.1984).

For purposes of determining this motion, I am not authorized to inquire into the merits of the lawsuit or to permit such inquiry to influence my decision on certification. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732

---

**5.** The state surveys provide a "snapshot" picture of the conditions of the patients observed and of Center at the time the survey was conducted. Although the failure to find staffing problems on any particular day is not evidence that problems did not exist at other times, the findings of staffing or environmental deficiencies on the day of a survey also does not prove that all residents were harmed by those deficiencies or that the same residents observed suffered the same conditions at all times.

**6.** Plaintiffs' expert in geriatrics, Dr. Nora Morgenstern, although sharply critical of the Center's staffing, declined to conclude that doctors at the Center provided substandard care.

(1974); *Anderson v. City of Albuquerque*, 690 F.2d 796, 799 (10th Cir.1982).

## Analysis

The parties dispute each element of the analysis. On the one hand, plaintiffs contend that this case is about a pattern of substandard care of all plaintiffs and class members resulting from the failure of the defendants to provide adequate staff and other resources. Plaintiffs focus on the basic or average needs of all the residents instead of the particular needs or circumstances of each individual and on the overall condition of the facility instead of the condition of each unit and/or room on a given day or time. On the other hand, defendants focus on the uniqueness of plaintiffs (and potential class members) as individuals, arguing that personal differences on the issues of liability, causation, and damages render this case inappropriate for class certification.

### 1. *Numerosity (Rule 23(a)(1)):*

The size of the proposed class is not determinative of the numerosity question; instead, "the real inquiry under Rule 23(a)(1) ... is whether joinder would be impractical." *Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 603 (D.Colo.1990). In determining whether joinder is impractical, the court looks at the size of the proposed class, the geographic dispersion of its members, and whether the members' names are easily ascertainable. *Id.*

Plaintiffs contend that the class could consist of up to 294 residents or former residents of the Center during the class period. They concede that the names may be ascertained from the defendants' records and that most potential class members, if not all, live in the Denver area. Nevertheless, they argue that joinder is impractical because of the strain on judicial economy and the inability (mental and financial) of class members to bring individual actions. They claim that individual lawsuits would not correct or expose the deficiencies in care alleged to exist at the Center. Ultimately, they contend that many of the members who remain at the Center might be reluctant to proceed individually for fear of reprisal.

The defendants argue that joinder is not impractical because forty percent of the proposed class are still residents at the Center; the remaining sixty percent of the members are deceased or live in other Denver care facilities. Defendants dispute the size of the class, stating that only thirteen plaintiffs have joined the lawsuit despite solicitation by the plaintiffs and news coverage of the action. (Plaintiffs contest the occurrence and/or extent of solicitation or publicity.) The fact remains that comparatively few patients have sought to join this matter even though it has been pending since August 1996.

The question is thus presented whether this is a case of "only" thirteen plaintiffs or of a significantly larger number. Plaintiffs provide little help in reliably estimating numbers other than to argue a class as small as twenty to forty-six might be certified. Plaintiffs' Response, p. 7. However, in *Fuzie v. Manor Care, Inc.*, 461 F.Supp. 689 (N.D.Ohio 1977), the court declined to certify a class of nursing home residents, in part because the numerosity requirement had not been satisfied. The purported class in *Fuzie*, which involved claims that a nursing home was systematically discharging or transferring Medicaid residents, was limited to a "small group of specific individuals" (apparently thirty-two persons), the majority of whom resided at the nursing home. In any case, the evidence of potential class size in this case leaves much room for speculation, raising questions whether the numerosity prerequisite has been shown. *Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656, 662 (N.D.Cal.1976).

I have already allowed joinder of several of the named plaintiffs (albeit without prejudice to the rights of defendants to move for separate trials later). *See Kohn v. American Hous. Found. I, Inc.*, 170 F.R.D. 474 (D.Colo.1996). Joinder may well be practicable, particularly if the number of claimants remains modest.

### 2. *Common Questions of Law or Fact (Rule 23(a)(2)):*

This element requires that there be issues of law or fact common to the class. *Joseph v.*

*General Motors Corp.,* 109 F.R.D. 635, 639 (D.Colo.1986). Because the issues of commonality and predominance are closely related, I address them jointly below. *See Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 627 (3d Cir.1996) (test of commonality is "subsumed" by the predominance requirement), *aff'd sub nom. Amchem Prods., Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

3. *Typicality of Claims or Defenses (Rule 23(a)(3)):*

 The claims or defenses of the named plaintiffs must be typical of, but need not be identical to, the claims or defenses of the class. *Joseph,* 109 F.R.D. at 640. "So long as there is a nexus between the class representatives' claims or defenses and the common questions of fact or law which unite the class, the typicality requirement is satisfied." *Id.*

Plaintiffs contend that the plaintiffs' claims arise from the same staffing shortage and substandard environmental conditions, are premised on same legal theories, and are subject to the same general defenses as those of the potential class members.

Defendants disagree, arguing that the plaintiffs themselves, without consideration of class members, demonstrate different types of injury and/or loss. National focuses on different time periods of residency and the fact that some but not all plaintiffs are Medicaid recipients. American emphasizes the differences between staffing needs resulting from the different kinds of patients in different units with different care requirements, arguing that a determination of whether care and treatment was adequate or appropriate "defies class-wide proof." In its brief (pp. 18–29), American provides a detailed review of the named plaintiffs, highlighting the differences in their situations

and individual claims to argue that none is typical.[7]

In reply, plaintiffs ask the court to look at the overall course of conduct: the failure adequately to staff the Center, resulting in substandard basic care, supervision, and environment.[8]

If shown, substandard care of plaintiffs may be representative of, or provide a nexus to, common questions of law or fact, at least to the extent one assumes greater care helps minimize harm to the patients. However, as discussed below, individual differences may well overwhelm typicality.

4. *Protection of Interests of Class: Adequate Representation (Rule 23(a)(4)):*

 The factors governing the element of adequate representation include whether the named plaintiffs have common interests with the class and whether the representatives will "vigorously prosecute the interests of the class through qualified counsel."[9] *Cook v. Rockwell Int'l Corp.,* 151 F.R.D. 378, 386 (D.Colo.1993). Plaintiffs contend these factors are met.

National refers to its arguments on commonality and typicality to challenge the existence of a common interest, stating that the differences in the individual claims adversely affect the fairness of certification to the members. National also argues that the plaintiffs might have different interests in proceeding, *i.e.,* that the personal injury plaintiffs would seek a more expeditious resolution than would the wrongful death plaintiffs. In light of the fact that plaintiffs have sought expedition of this action from the onset, I find this argument unpersuasive.

American argues that the named plaintiffs may not have the best interests of the class at heart because they dropped individual claims for professional malpractice which, ac-

---

**7.** At the time American filed its brief, there were eight plaintiffs. The complaint has since been amended to add additional plaintiffs.

**8.** Plaintiffs argue that the fact that some patients were private-pay rather than on Medicaid is irrelevant because 42 U.S.C. § 1396r(c)(4) requires identical policies and practices regarding provision of services for all individuals regardless of source of payment. Further, plaintiffs main-

tain that differences in times and lengths of residency are irrelevant because the conditions and conduct of defendants did not change materially during the course of the class period.

**9.** The defendants do not challenge the qualifications of plaintiffs' counsel, who have extensive experience in class actions.

cording to American, could bar members of the class from bringing these claims in subsequent actions.

Plaintiffs reply, asserting a common interest in fair and expeditious resolution of their claims and disputing that they have abandoned any individual claims; a claim for injunctive relief was dropped because National is no longer the manager of the Center.

I conclude plaintiffs have demonstrated adequate representation.

### 5. Predominance of Common Questions of Law or Fact (Rule 23(b)(3)):

■ Plaintiffs must show that common questions of law or fact predominate over the individual issues of members and that a class action would be superior to other means of conducting this case. Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3) lists some of the pertinent determining factors to be considered in determining predominance and superiority: (1) the interest of members of the class in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. I do not resolve whether individual claimants are better served by a class action versus a separate action (factor 1) although I suspect that depends upon the strength of the particular claimant's case (certification may well assist the weaker case, Castano v. American Tobacco Co., 84 F.3d 734, 746 (5th Cir.1996)). No prior litigation concerning the controversy has been brought to my attention (factor 2). Therefore, the focus of my analysis is on the benefit of concentrating all the claims in one forum (factor 3) and the difficulties of managing all claims as a class action (factor 4).

Essentially, plaintiffs claim commonality and predominance through their common legal theories to establish liability but not damages on the basis of alleged substandard staffing levels and environmental conditions. Defendants dispute whether any substandard care occurred, but, regardless, insist that the circumstances of each patient are highly individualized and that liability should not be determined without also deciding cause and damage issues.

■ In this type of case, plaintiffs' attempt to isolate the issue of potential liability-creating conduct from the issues of causation and damages may be a good tactic for plaintiffs, but I question whether it is conducive of a reasoned and fair process to determine whether defendants are liable to class members. My initial concern is whether it is appropriate or even meaningful to ask a jury to undertake an analysis to decide in the abstract that defendants are, say, guilty of negligence *per se* without knowing whether the alleged negligence caused any harm.[10] Causation and damages are integral, indispensable parts of the question of liability. *See Canape v. Petersen,* 897 P.2d 762, 768 (Colo.1995). The fact that possible injury may result from some act or omission may give it some quality of wrongdoing, but that possibility is not sufficient to "impose any liability or give rise to a cause of action." *White v. Schnoebelen,* 91 N.H. 273, 18 A.2d 185, 186 (1941). The seasoned wisdom of the New Hampshire court remains cogently applicable to the issues of this case:

> If 20 persons were endangered by an act having the possibility of injury, it would be absurd to say that rights of action accrued to all of them at the moment the defendant's act was completed.... Only if and when harm came to any one of the 20 would a right of action accrue.... There is an actionable breach of duty only when the injury happens.

*Id.*

Simply stated, defendants are not negligent if their acts were not a proximate cause of plaintiffs' injury. *Lyons v. Nasby,* 770 P.2d 1250, 1256 (Colo.1989), and, hence, the

---

10. Is a person driving in excess of the speed limit down an empty highway on a clear day negligent *per se?* We don't ask a jury that sort of theoretical (philosophical?) question. If someone is on the highway and an accident results, then we can determine the driver's liability, but only with reference to the circumstances of causation and damage for that particular case.

liability issue cannot be decided in the abstract without the particularized proof of cause and damage concerning each patient.[11] The need for that proof is heightened for plaintiffs' negligence *per se* claim because they must also show, before liability attaches, that the injuries suffered are the type the particular statute was enacted to prevent. *Id.* at 1257.

Even if it were possible to determine liability separate from cause and damage in this case, I am concerned that the claimed efficiency of a class action would be at the expense of fairness. Plainly, were plaintiffs to be successful, class certification of liability would constitute an invitation to make claims not previously contemplated or even to encourage "unmeritorious claims." *Castano v. American Tobacco Co.,* 84 F.3d at 746. It is understandable that plaintiffs seek the advantages created by certification, including dramatic improvement of chances of success and higher damage awards, *id.,* but to confer that ·advantage without determining legally essential elements of liability does not comport with fairness or rational decision-making.

Plaintiffs gloss over this important issue, in essence arguing that the alleged inadequate staffing and substandard environment necessarily caused damage to each patient and that the amount of that damage can be determined in a subsequent proceeding. In effect, plaintiffs wish me to treat the patients as indistinguishable beings which necessarily suffer harm as a result of the alleged acts or omissions of defendants. I cannot so conclude. On the record before me, the members of the class are individuals who may or may not have been exposed to defendants' alleged substandard conduct and, if so, who may or may not have been harmed thereby. (Obviously, defendants' evidence disproves the concept of the inevitability of damage.) Certification on the sole issue of liability may well have merit in certain cases, particularly where a single event such as a plane crash is involved. Where, as here, the issue is one of standard of long-term care of patients who are concededly in differing circumstances, such an approach is problematic and inconsistent with established authorities.

Asbestos litigation is a good analogy. The single issue of harmfulness of asbestos, like the standard of care provided here, does not override the individual characteristics of each plaintiff. "Differences in amount of exposure and nexus between exposure and injury lead to disparate applications of legal rules, including matters of causation, comparative fault, and types of damages available to each plaintiff." *Georgine v. Amchem Prods., Inc.,* 83 F.3d at 627. The court distinguished the single accident or issue case from those involving substandard care issues in which no one set of facts or proximate cause apply equally to each potential class member or each defendant. *Id.* at 628–29.

Similarly, the common use of an allegedly defective ligament device in scores of operations is not appropriate for class treatment where individualized issues of implantation, informed consent, differing types of implants and so forth are involved. *Hum v. Dericks,* 162 F.R.D. 628 (D.Hawaii 1996).

The Colorado Supreme Court held that class certification solely on liability issues is not appropriate where certification would require ignoring causation and damages. *Goebel v. Colorado Dep't of Insts.,* 764 P.2d 785 (Colo.1988). Whether a duty existed for the benefit of claimants is "more appropriately to be considered in the context of the particular facts giving rise to the asserted duty." *Id.* at 807.

▮ Class certification is simply not appropriate where "causation in a personal injury case predicated on exposure to [substandard care and environment] 'will necessarily be different for every person in the proposed class, based on each person's length of exposure to [the substandard care], notice, pre-existing medical conditions and other factors.'" *Hurd v. Monsanto Co.,* 164 F.R.D. 234, 240 (S.D.Ind.1995) (proposed class of plaintiffs exposed to tox-

---

11. There may be wide-ranging differences among plaintiffs and potential class members. As defendants point out, the issue of causation alone highlights the possibilities of significant differ-ences in medical histories, percentage of fault, mitigation, non-parties at fault, times of residency, and variations in claims against the defendants.

ic compounds over period of twenty years should not be certified where questions of exposure and injury exist) (quoting *Commonwealth of Puerto Rico v. M/V Emily S,* 158 F.R.D. 9, 15 (D.P.R.1994)). *See also Davenport v. Gerber Prods. Co.,* 125 F.R.D. 116, 120 (E.D.Pa.1989) (in case involving Nursing Mouth Syndrome, "certification on the narrow issue [of duty] does not advance this litigation in light of the fact that virtually all of the issues related to liability would remain unresolved on an individual basis").

Finally, my findings and conclusions are consistent with that of my colleague, Judge Zita Weinshienk, and the Tenth Circuit Court of Appeals in deciding that class certification was not appropriate where the relief sought, as here, was primarily money damages and where the impact upon class members was variable. *Boughton v. Cotter Corp.,* 65 F.3d at 827.

The *Boughton* case also emphasizes the important distinction between Rule 23(b)(2) and Rule 23(b)(3). If plaintiffs sought class certification for injunctive relief, it may well have been legally permissible. *Id.* If plaintiffs had sought an order requiring defendants to provide more staffing, for example, the analysis would not become entangled with the issues of predominance. *See Goebel v. Colorado Dep't of Insts.,* 764 P.2d at 807–08, and *Rice v. City of Philadelphia,* 66 F.R.D. 17 (E.D.Pa.1974).[12] *See also Davenport,* 125 F.R.D. at 120 (denying certification where final relief sought was money damages rather than injunction).

Because the liability of the defendants in this case cannot be determined in the absence of findings on causation and harm, the common questions of adequacy of care and environment do not predominate.

### 6. *Superiority of Class Action (Rule 23(b)(3)):*

Plaintiffs argue that class certification on the issue of liability would provide the most cost-efficient and fairest method of proceeding, preserve claims of low-income, vulnerable class members, and result in consistent rulings. Because the issues common to the class do not predominate, however, the proliferation of individual issues of causation and harm presents a significant potential for confusion, inefficiency, duplication, splintering of subclasses, and, indeed, individualization of each class member. The necessity of determining causation and harm in this case for damages minimizes the effect the common issues might have on judicial economy. I conclude that a class action is not superior given the circumstances of this case.

### *Conclusion*

Based upon the findings and reasons discussed above, I conclude that class certification of the liability issues presented in this case is not appropriate. Accordingly, plaintiffs' motion for class certification is denied.

---

**12.** In their Motion for Reconsideration, plaintiffs submit a recent decision by Judge Morris B. Hoffman of the Denver District Court of the State of Colorado as authority for their arguments. *Della Salas, et al. v. Gran Care, Inc., et al.,* 96–CV–4449, District Court, City and County of Denver, State of Colorado. Plaintiffs' reliance is misplaced. Consistent with my analysis here, Judge Hoffman premised his decision on the nature of the remedies sought. He found that class certification for health facility residents was appropriate where restitutional relief was sought, particularly because they, contrary to plaintiffs here, did "not seek damages for any individual physical harm they may have suffered as a result of this alleged mistreatment." Most pertinent to the matters here, Judge Hoffman then addressed damages similar to those claimed by plaintiffs with the following language: "However, the same cannot be said of Plaintiffs' request for emotional distress damages. These damages, by their very nature, are highly individualized.... I therefore conclude that the class-wide request for emotional distress damages is not appropriate for class treatment...." *Id.* at 17.